SYNERGY SPORT INTERNATIONAL, LTD., PLAINTIFF *v.*
UNITED STATES, DEFENDANT

Court No. 91–11–00836

(Dated January 12, 1993)

*Sandler, Travis & Rosenberg* (*Leonard L. Rosenberg* and *Ronald W. Gerdes*) for plaintiff.

*Stuart M. Gerson,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Susan Burnett Mansfield*) for defendant.

## OPINION

RESTANI, *Judge:* Plaintiff, Synergy Sport International, Ltd. ("Synergy"), challenges the decision of the United States Customs Service ("Customs"), which valued imported goods at the price paid by the U.S. customer to the importer rather than the price paid by the importer to its foreign supplier. Both Synergy and the United States move for partial summary judgment on the issue of which price provided the proper basis for valuation. Synergy's motion is granted, and the United States' motion is consequently denied.

## BACKGROUND

This case involves three main players: a manufacturer, an importer, and a U.S. customer of the importer. The China National Textiles Import and Export Corporation ("Chinatex"), which manufactured the goods, is located in the People's Republic of China. Synergy, the importer, is a Hong Kong corporation with offices in the United States.[1] The U.S. customer of Synergy is J.C. Penney Co., Inc. ("J.C. Penney").

In a "sales confirmation" agreement dated November 21, 1990, Chinatex and Synergy agreed to "close * * * transactions" concerning the manufacture of 17,000 dozen cotton twill pants. Synergy promised to buy 10,000 dozen pants at $58.00 per dozen and 7,000 dozen higher quality pants at $61.00 per dozen. Plaintiff's Appendix ("App.") at 52.

During the fall of 1990, a J.C. Penney representative made inquiries into Synergy's ability to supply a pant made to J.C. Penney's specifications. J.C. Penney provided Synergy with a sample pant, which was used by Chinatex to manufacture a sample production pant. After seeing the sample production pant, J.C. Penney ordered cotton twill pants from Synergy's U.S. representative on December 12, 1990 at a price of $10.29 per unit, or $123.48 per dozen. Synergy's U.S. office accepted the order the next day.

Synergy subsequently obtained from Overseas Trust Bank Ltd. a letter of credit issued on December 18, 1990 and amended on December 28,

---

[1] Although the government admits only that Synergy is allegedly organized under the laws of Hong Kong, the government has not submitted any evidence to refute that allegation.

1990, directing the bank to pay Chinatex $58.00 per dozen for 2,044 dozen pants. *Id.* at 53–56. Chinatex was unable to draw upon the funds made available by the letter of credit until it provided the bank with an onboard bill of lading. *Id.* at 53. The bill of lading was issued January 15, 1991 when the goods were transferred to a common carrier. *Id.* at 60.

The merchandise arrived in Oakland, California, the port of entry, on or about February 14, 1991. Synergy attempted to enter the merchandise at the price which it had paid to the manufacturer, namely, $58.00 per dozen with some adjustments. Customs rejected this attempted entry and valued the merchandise at the price which J.C. Penney had contracted to pay Synergy, far higher than the Synergy-Chinatex price. Customs released the merchandise on March 1, 1991 and Synergy subsequently shipped it to J.C. Penney. Synergy received payment in the form of a check from J.C. Penney dated April 22, 1991. Liquidation occurred on July 12, 1991. Synergy protested the valuation, and Customs denied the protest. Synergy then filed this action.

### STANDARD OF REVIEW

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In addition, the plaintiff has the burden of presenting sufficient evidence to overcome the presumption that the Customs Service has valued the merchandise correctly. 28 U.S.C. § 2639(a)(1) (1988); *see Orbisphere Corp. v. United States,* 13 CIT 866, 866, 726 F. Supp. 1344, 1344 (1989).

### DISCUSSION

The preferred statutory basis for the valuation of imported merchandise is transaction value, defined as "the price actually paid or payable for the merchandise when sold for exportation to the United States." 19 U.S.C. § 1401a(b)(1) (1988).[2] The statute further provides that merchandise may *not* be valued on the basis of "a system that provides for the appraisement of imported merchandise at the higher of two alternative values." *Id.* § 1401a(f)(2)(B).

Neither party seriously argues that the sales confirmation agreement constitutes a proper basis for the statutory valuation of imported merchandise.[3] The Customs Service contends that the Synergy-J.C. Penney sale, as the transaction which most directly caused exportation to the United States, should be used to calculate the transaction value of the imported merchandise. Synergy argues that Customs is statutorily re-

---

[2] Less preferred bases are deductive value, or the price at which the merchandise is sold after importation into the United States, 19 U.S.C. § 1401a(a)(1)(D), (d)(2)(B), and computed value, which consists of amounts for the cost of raw materials and labor, profit and general expenses. *Id.* § 1401a(a)(1)(E), (e)(1).

[3] Synergy argues that a completed exchange of goods, rather than a contract for sale such as the sales confirmation agreement, is the proper statutory basis for valuation. The Customs Service contends that the sales confirmation agreement is neither a sale nor a contract for sale. At oral argument, both parties presumed that Hong Kong or Chinese law governed the agreement, but neither knew whether such an agreement would be binding under the laws of those countries.

quired to value the transaction based on the Chinatex-Synergy sale, the lower of two alternative values.

Although this court in the past has acknowledged Customs' policy of valuing imports based on the sale which most directly caused the exportation, *see, e.g., Brosterhous, Coleman & Co. v. United States,* 14 CIT 307, 309, 737 F. Supp. 1197, 1199 (1990), recent Federal Circuit law has expressed serious disapproval of the "most direct cause of exportation" test:

> we can discern nothing in the legislative history of the 1979 amendment that suggests that Customs, in determining the transaction value of imported merchandise, should undertake an investigation focusing on which of two transactions most directly caused the exportation. The "Customs policy" followed by *Brosterhous* proceeds from an invalid premise. To the extent *Brosterhous* * * * require[s] a weighing of the relative importance of two viable transactions, it is overruled.

*Nissho Iwai American Corp. v. United States,* No. 92–1239, Slip Op. at 16 (Fed. Cir. Dec. 28, 1992). This court also notes that if the "most direct cause of exportation" test compels use of the middleman-retailer price whenever the retailer's order causes the middleman to complete a sale with the exporter, Customs likely will have enacted a system requiring use of the alternative higher price in conflict with 19 U.S.C. § 1401a(f)(2)(B).

In place of the "most direct cause of exportation" test, the Federal Circuit in *Nissho Iwai* applied the standard followed in *E.C. McAfee Co. v. United States,* 6 Fed. Cir. (T) 92, 842 F.2d 314 (Fed. Cir. 1988). *Nissho Iwai,* No. 92–1239, Slip Op. at 16. The standard in *McAfee* is that "if the transaction between the manufacturer and the middleman falls within the statutory provision for valuation, the manufacturer's price, rather than the price from the middleman to his customer, is used for appraisal." *McAfee,* 6 Fed. Cir. (T) at 97, 842 F.2d at 318. A transaction viable under the statute is a sale negotiated at arm's length free from any nonmarket influences and involving goods clearly destined for export to the United States. *Nissho Iwai,* No. 92–1239, Slip Op. at 10–11.

In the case currently being decided, there was no allegation that the price paid by Synergy to Chinatex was artificially low due to a lack of arm's length bargaining or nonmarket conditions. Moreover, the merchandise involved was clearly destined for export to the United States. Not only were the goods shipped directly from Chinatex to Oakland, California, but also "[t]he labels required to be placed on the garments *. * * reflect the fact the goods are destined for the United States, and always for a particular ultimate customer." Plaintiff's Memorandum in

Support of Plaintiff's Motion for Partial Summary Judgment at 5.[4] Therefore, the Synergy-Chinatex transaction constitutes a statutorily viable sale.

In short, prior case law directs Customs to rely on the sale between the middleman and the manufacturer to determine transaction value if the sale falls under the statute. Thus, the United States Customs Service erred when it valued the imported merchandise at the price paid by the U.S. customer to the importer, rather than the price paid by the importer to the manufacturer. In light of this conclusion, there is no need to consider whether the sale between Synergy and J.C. Penney is one "for exportation" within the meaning of 19 U.S.C. § 1401a(b)(1). Plaintiff's motion for partial summary judgment on the issue of improper valuation is granted.

---

[4] As the Federal Circuit has stated, "[a] determination that goods are being sold or assembled for exportation to the United States is fact-specific and can only be made on a case-by-case basis." *McAfee,* 6 Fed. Cir. (T) at 98, 842 F.2d at 319. This court, however, disagrees with defendant's contention that the site of incorporation or the nationality of the parties is important to a case-by-case analysis. Excess reliance on the incorporation or nationality of the parties can only lead to misapplication of the statute.